# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Spybar Management, LLC | Case No. 19-05128 |
| Debtor. | Hon. Carol A. Doyle |

## DISCLOSURE STATEMENT FOR DEBTOR'S AMENDED CHAPTER 11 PLAN OF REORGANIZATION

### AUGUST ___, 2019

E. Philip Groben (ARDC# 6299914)
Email: pgroben@gcklegal.com
Matthew T. Gensburg (ARDC# 6187247)
Email: mgensburg@gcklegal.com
GENSBURG CALANDRIELLO & KANTER, P.C.
200 West Adams St., Ste. 2425
Chicago, Illinois 60606
Phone:  312-263-2200
Fax:  312-263-2242

*Counsel for the Debtor and Debtor-in-Possession*

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ILLINOIS UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.

## IMPORTANT DATES

- Date and time by which Ballots must be received: _____, 2019 at 5:00 p.m. (Prevailing Central Time)

- Date by which objections to Confirmation of the Plan must be filed and served: _____ ___, 2019.

- Hearing on Confirmation of the Plan: ___, 2019 at _____ a.m. (Prevailing Central Time)

## SUMMARY OF PLAN DISTRIBUTION

| Class | Claim(s) Included in Class | Proposed Treatment of Class by Plan | Estimated Class Dollar Size | Projected Recovery | Status | Voting Rights |
|---|---|---|---|---|---|---|
| I | Secured Claim held by Byline Bank | Payment in full from operation of business during repayment months 1 through 60. | $485,708.95 | 100% | Impaired | Yes |
| II | Allowed Unsecured Claims entitled to Priority | Payment in full from operation of business during months 1-60 | $26,641.23 | 100% | Impaired | Yes |
| III | Allowed General Unsecured Claims | Payment in full from operation of business during months 6-60. | $231,926.78 | 100% | Impaired | Yes |
| IV | Unsecured Claims of $1,500 or less | Payment in full from operation of business during months 1-3 | $13,708.72 | 100% | Impaired | Yes |
| IV | Allowed Unsecured Claims held by Insiders | Subordinated Promissory Notes payable only after completion of all other Plan payments. | $285,000.00 | 0% | Impaired | Yes |
| V | Equity Interests | No cash distribution pursuant to the Plan. | Not Applicable | Unknown | Impaired | No (presumed to accept) |

As set forth in Sections VI.D2 and VI.D5 *infra*, funding for distributions as set forth in the Plan shall be derived from the ongoing post confirmation operations of the Debtor, and while the Debtor retains certain Causes of Action, it does not rely upon recoveries from these Causes of Action to make Plan distributions.

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................................................................3
DISCLAIMER...................................................................................................................................5
I. INTRODUCTION..........................................................................................................................7
    A.    Only Impaired Classes Receive a Distribution Vote .........................................................8
    B.    Voting Procedures.............................................................................................................8
    C.    Confirmation Hearing ......................................................................................................9
II. OVERVIEW OF THE PLAN .........................................................................................................9
    A.    Treatment of Claims and Interests .................................................................................10
    B.    Summary and Treatment of the Allowed Administrative and Priority Tax Claims .........10
    C.    Summary, Classification, and Treatment of Allowed Claims and Interests....................10
III. FINANCIAL DIFFICULTIES AND BACKGROUND OF DEBTOR .....................................................11
    A.    Corporate History and Events Leading to Chapter 11 Filing. ........................................11
    B.    The Debtor's Prepetition Capital Structure. ...................................................................12
    C.    Notable Assets of the Debtor. ........................................................................................13
    D.    Management of the Debtor. ............................................................................................13
    E.    Ownership of the Debtor. ...............................................................................................13
IV. EVENTS DURING THE CHAPTER 11 CASE ...............................................................................14
    A.    Continuation of Business After the Petition Date. ..........................................................14
        A.1.    First Day Motions ..................................................................................................14
        A.2. Subsequent Motions .........................................................................................................14
    B.    Employment and Retention of Advisors. ........................................................................15
    C.    Monthly and Quarterly Professional Fee Applications. ..................................................15
    D.    The Debtor's Schedules and SOFA ................................................................................16
    E.    Exclusivity .....................................................................................................................16
    F.    Post-Petition Operations. ...............................................................................................16
    G.    Monthly Operating Reports. ...........................................................................................17
V. SUMMARY OF THE PLAN .........................................................................................................17
    A.    Overview of Chapter 11. ................................................................................................17
    B.    Claims and Bar Dates. ....................................................................................................18
        B.1.    Bar Dates. .............................................................................................................18
        B.2.    Claims. .................................................................................................................19
        B.3.    Objections to Claims. ............................................................................................19
    C.    Administrative Expense Claims. .....................................................................................19
    D.    Classification and Treatment of Claims and Equity Interests. .........................................20
        D.1.    Class I – Allowed Secured Claim of Byline Bank. .................................................20
        D.2.    Class II – Allowed Unsecured Claims Entitled to Priority by the Bankruptcy Code............21
        D.3.    Class III – Allowed non-Insider General Unsecured Claims. ...................................21
        D.4.    Class IV – Allowed Unsecured Claims of $1,500.00 or less. ...................................21
        D.5.    Class V – Allowed Insider General Unsecured Claims. ...........................................22
        D.5.    Class VI – Equity Interests. ...................................................................................22
    E.    Means for Implementation of the Plan. ..........................................................................23
        E.1.    Income Generated from Operation of the Debtor ...................................................23
    F.    Assumption or Rejection of Executory Contracts and Unexpired Leases. .......................23
        F.1.    Approval of Assumption or Rejection of Executory Contracts. ...............................23
        F.2.    Cure of Defaults. ..................................................................................................24
        F.3.    Claims under Rejected Executory Contracts and Unexpired Leases. .......................24
        F.4.    Preexisting Obligations Under Executory Contracts and Unexpired Leases. ...........25
        F.5.    Modifications, Amendments, Supplements, Restatements, or Other Agreements......25
    G.    Procedures for Resolving Disputed Claims and Interests. ...............................................25
        G.1.    Allowance of Claims and Interests. .......................................................................25
        G.2.    Claims and Interests Administration Responsibilities. ............................................25
        G.3.    Estimation of Claims and Interests. .......................................................................26
        G.4.    Adjustment to Claims Without Objection. ..............................................................26
        G.5.    Amendments to Claims. ........................................................................................26

H.      Distributions..................................................................................................................27
   H.1.      Initial Distribution....................................................................................................27
   H.2.      Distributions as to Allowed Claims in Classes V. ..................................................27
   H.3.      Compliance with Tax Requirements........................................................................28
I.      Exculpation from Liability, Release, and General Injunction. ..........................................28
   I.1.      Exculpation from Liability.......................................................................................28
   I.2.      Release......................................................................................................................28
   I.3.      General Injunction....................................................................................................29
   I.4.      Term of Certain Injunctions and Automatic Stay. ..................................................29
   I.5.      Guarantor Injunction................................................................................................30
VI. GENERAL INFORMATION ON VOTING AND CONFIRMATION PROCEDURE .........................30
  A.      Purpose of Disclosure Statement.............................................................................30
  B.      Voting on the Plan....................................................................................................30
   B.1.      Who May Vote. ........................................................................................................31
   B.2.      Eligibility..................................................................................................................31
   B.3.      Binding Effect..........................................................................................................31
  C.      Procedure/Voting Deadlines. ...................................................................................32
  D.      Plan Confirmation Process.......................................................................................32
   D.1.      Acceptance by All Impaired Classes .......................................................................32
   D.2.      Feasibility ................................................................................................................33
   D.3.      "Best Interests" Test. ...............................................................................................34
   D.4.      Costs and Expenses of Liquidation..........................................................................34
   D.5.      The Plan Meets the Best Interests Test ...................................................................34
  F.      Confirmation ............................................................................................................36
   F.1.      Confirmation Hearing...............................................................................................36
   F.2.      Confirmation Standards............................................................................................36
   F.3.      Objections to Confirmation......................................................................................38
  G.      "Cramdown" Provisions...........................................................................................38
VII. RISK FACTORS..................................................................................................................39
  A.      Bankruptcy Factors..................................................................................................39
   A.1.      Classifications of Claims and Equity Interests .......................................................39
   A.2.      Failure to Receive Requisite Accepting Votes .......................................................39
   A.3.      Failure to Confirm the Plan .....................................................................................39
   A.5.      Alternative Chapter 11 Plan.....................................................................................40
VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............................................................40
  A.      Certain U.S. Federal Income Tax Consequences to the Debtor ..............................41
  B.      Importance of Obtaining Professional Tax Assistance.............................................42
IX.      ALTERNATIVES TO THE PLAN ............................................................................................42
  A.      Liquidation under Chapter 7 ....................................................................................43
  B.      Dismissal ..................................................................................................................43
  C.      Alternative Plan Structures.......................................................................................43
X. RECOMMENDATIONS...........................................................................................................43
XI. CONCLUSION ......................................................................................................................44

## DISCLAIMER

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE CHAPTER 11 PLAN OF REORGANIZATION FILED BY THE SPYBAR MANAGEMENT, LLC, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND ANY OTHER PLAN DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT (A) THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF, OR (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR WITH "ADEQUATE INFORMATION" WITHIN THE MEANING OF THE BANKRUPTCY CODE, SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTOR SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

NOTHING CONTAINED IN THE DISCLOSURE STATEMENT CONSTITUTES AN ADMISSION OR ACKNOWLEDGMENT THAT ANY CLAIMS DESCRIBED AND IDENTIFIED IN THE DISCLOSURE STATEMENT ARE VALID, ENFORCEABLE, ALLOWABLE, OR NOT SUBJECT TO DISPUTES, COUNTERCLAIMS OR SETOFFS. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.  PARTIES

SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISORS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.

THE DEBTOR RESERVES THE RIGHT TO OBJECT TO THE AMOUNT OR CLASSIFICATION OF ANY CLAIM OR INTEREST.  THEREFORE, A CLAIM HOLDER WHOSE CLAIM IS SUBJECT TO AN OBJECTION MAY NOT RECEIVE THE SPECIFIED SHARE OF THE ESTIMATED DISTRIBUTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT.

# I. INTRODUCTION

On February 27, 2019 (the "**Petition Date**"), Spybar Management, LLC (the "**Debtor**" or "**Spybar**") filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Northern District of Illinois.  This Disclosure Statement (the "**Disclosure Statement**") is being provided by the Debtor pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of votes for the acceptance or rejection of the Debtor's Amended Plan of Reorganization (the "**Plan**") filed _____, 2019.  A copy of the Plan is attached hereto as **Exhibit A**.

The purpose of this Disclosure Statement is to set forth information (a) regarding the Debtor's history, its business and the Chapter 11 Case, (b) concerning the Plan and alternatives to the Plan, (c) advising the Holders of Claims against and Equity Interests in the Debtor of their rights under the Plan, (d) assisting the Holders of Claims against and Equity Interests in the Debtor in making an informed judgment regarding whether they should vote to accept or reject the Plan and (e) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

Following a hearing held on [_____], this Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" in accordance with Section 1125 of the Bankruptcy Code.  Pursuant to section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests in the relevant class to make an informed judgment about the plan."

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION SUPPLEMENTARY TO THE PLAN AND IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN.  CREDITORS AND INTEREST HOLDERS ARE ADVISED TO STUDY THE PLAN CAREFULLY TO DETERMINE THE PLAN'S IMPACT ON THEIR CLAIMS OR INTERESTS.  THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  ALTHOUGH THE DEBTOR HAS ATTEMPTED TO ENSURE THE ACCURACY OF THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN, NEITHER THE DEBTOR NOR ITS RESPECTIVE PROFESSIONALS CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN AND THEREIN IS WITHOUT INACCURACIES OR ERRORS.

This Disclosure Statement contains important information that may bear upon your decision to accept or reject the Plan.  The Disclosure Statement also provides information regarding alternatives to the Plan.  Each Holder of a Claim or Equity Interest should read this Disclosure Statement and the Plan in their entirety.  If you are a Holder of a Claim or Equity Interest that is entitled to vote to accept or reject the Plan, a ballot for the acceptance or rejection of the Plan (the "**Ballot**") is enclosed herewith.  After carefully reviewing these documents, please indicate your vote with respect to the Plan on the enclosed Ballot and return it as instructed below and on the Ballot.

The information set forth herein is the product of the Debtor's books and records, available at the time of preparing this Disclosure Statement. Although the Debtor has made reasonable efforts to ensure the accuracy and completeness of the information set forth herein, subsequent information or discovery may result in changes to this Disclosure Statement. Furthermore, the Debtor may supplement or amend this Disclosure Statement or any exhibits, schedules, and appendices attached hereto at any time prior to the hearing to approve this Disclosure Statement.

**UNLESS OTHERWISE DEFINED HEREIN, ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

## A.    Only Impaired Classes Receive a Distribution Vote

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. If the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such Plan under Section 1126(g) of the Bankruptcy Code and therefore, such holders do not cast votes on such Plan. In addition, Classes of Claims that are "unimpaired" are deemed to have accepted the Plan and do not cast votes on the Plan.

Holders of Claims in Classes I, II, III, IV, and V are Impaired and are entitled to vote on the Plan. Holders of Equity Interests in Class VI are unimpaired and presumed to accept the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED TO HOLDERS OF CLAIMS IN CLASSES I, II, III, IV, AND V.**

The Plan Supplement is attached hereto as **Exhibit D**. Holders of Claims or Equity Interests may obtain copies of the Plan Supplement by: (a) accessing the case docket through (i) visiting the office of the Clerk of Court for the Bankruptcy Court for the Northern District of Illinois located within the Dirksen Federal Courthouse, 219 S. Dearborn St., Chicago, Illinois, 60604, (ii) via the internet through PACER or CM/ECF, or (b) by requesting a copy from Debtor's counsel via email at pgroben@gcklegal.com.

For a summary of the treatment of each Class of Claims and Equity Interests, see Section II.C. of this Disclosure Statement, "Summary, Classification, and Treatment of Allowed Claims and Interests" below.

## B.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot for the acceptance or rejection of the Plan is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used to vote in each separate Class. Please vote and return your Ballot(s) by hand delivery, courier service, overnight mail, or first-class US mail to the address set forth below:

US Bankruptcy Court
Eastern Division
219 S. Dearborn
Chicago, IL 60604

TO BE COUNTED, YOUR BALLOT WITH ORIGINAL SIGNATURE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **MUST BE RECEIVED** NO LATER THAN **5:00 P.M. (PREVAILING CENTRAL TIME) ON _____ 2019** (the "**Voting Deadline**").

If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact the counsel for the debtor by email pgroben@gcklegal.com, by phone at (312) 263-2200, or by first-class mail, hand delivery, courier service or overnight mail to E. Philip Groben, c/o Gensburg Calandriello & Kanter, P.C., 200 W. Adams St., Ste. 2425, Chicago, IL 60604.

## C.      Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for **[_____], 2019 at [_____] (prevailing Central Time)** in the Bankruptcy Court, Everett McKinley Dirksen Building, U.S. Courthouse, 219 South Dearborn Street, Courtroom 742, Chicago, Illinois 60604 (the "**Confirmation Hearing**").  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and Filed on or before **_____, 2019, at 5:00 p.m. (prevailing Central Time)** (the "**Confirmation Objection Deadline**") in the manner described in the Confirmation Hearing Notice accompanying this Disclosure Statement.  The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned or an appropriate Filing on the Bankruptcy Court's docket.

THE DEBTOR URGES ALL HOLDERS OF CLAIMS IN CLASSES I THROUGH CLASS V TO VOTE IN FAVOR OF THE PLAN.

## II. OVERVIEW OF THE PLAN

The following is a brief summary of the treatment of claims and interests under the plan.  The description of the plan set forth below constitutes a summary only and is qualified, in its entirety, by the plan, the plan supplement, and any other plan documents.  Creditors, interest holders, and other parties in interest are urged to review the plan itself, and not to rely on the summary provided herein.  In the event of an inconsistency between this disclosure statement and the plan, the plan shall control.

**A.      Treatment of Claims and Interests**

The classification and treatment of Claims and Equity Interests under the Plan are described in Section IV.C. below.   Because the Plan provides the greatest likelihood of recovery to all Holders of Allowed Claims and Allowed Equity Interests in this Chapter 11 Case, the Debtor strongly encourages all Holders of Claims and Equity Interests entitled to vote on the Plan to vote to accept the Plan.

The Plan divides all Claims against the Debtor into various Classes.  The Table set forth below summarizes the Classes of Claims and Interests under the Plan, the treatment of Claims and Interests, and projected recovery for Holders of Allowed Claims and Interests in such Classes and the entitlement of Holders of Claims and Interests in such Classes to vote to accept or reject the Plan.

**B.      Summary and Treatment of the Allowed Administrative and Priority Tax Claims**

| Claim | Estimated Amounts of Claims | Proposed Treatment by Plan | Projected Recovery Under the Plan |
|---|---|---|---|
| Administrative Expense Claims | $0.00 | Payment in full in cash. | 100% |
| Professional Claims | $81,000.00 | Payment in full in cash. | 100% |
| Priority Tax Claims | $331,551.87[1] | Payment in full in cash. | 100% |

**C.      Summary, Classification, and Treatment of Allowed Claims and Interests**

| Class | Claim(s) Included in Class | Proposed Treatment of Class by Plan | Estimated Class Dollar Size | Projected Recovery | Status | Voting Rights |
|---|---|---|---|---|---|---|
| I | Secured Claim held by Byline Bank | Payment in full from operation of business during repayment months 1 through 60. | $485,708.95 | 100% | Impaired | Yes |
| II | Allowed Unsecured Claims entitled to Priority | Payment in full from operation of business during months 1-60 | $26,641.23 | 100% | Impaired | Yes |

---

[1] Claim size subject to objection, see Section V.C. *infra*.

| III | Allowed General Unsecured Claims | Payment in full from operation of business during months 6-60. | $231,926.78 | 100% | Impaired | Yes |
|---|---|---|---|---|---|---|
| IV | Unsecured Claims of $1,500 or less | Payment in full from operation of business during months 1-3 | $13,708.72 | 100% | Impaired | Yes |
| IV | Allowed Unsecured Claims held by Insiders | Subordinated Promissory Notes payable only after completion of all other Plan payments. | $285,000.00 | 0% | Impaired | Yes |
| V | Equity Interests | No cash distribution pursuant to the Plan. | Not Applicable | Unknown | Unimpaired | No |

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto. The Debtor is proposing a Five-Year Plan, in which the Debtor is the disbursing agent. The Plan will be funded from the revenues generated from the Debtor's continued operations.

Creditors who have been listed on Debtor's schedules, but have not filed proofs of claim, and have not been listed as "disputed, unliquidated, or contingent," will be paid according to the claim amount listed in the Debtor's schedules, unless the Debtor objects to the claim within the time set forth in the Debtor's plan.

### III. FINANCIAL DIFFICULTIES AND BACKGROUND OF DEBTOR

#### A.   Corporate History and Events Leading to Chapter 11 Filing.

Spybar is an Illinois limited liability company, organized on January 8, 2008. In conjunction with a non-filing affiliate Skyline Management, LLC ("**Skyline**"), the Debtor operates Spybar Chicago, a nightclub in Chicago's vibrant River North neighborhood. Spybar owns or controls all of the assets necessary for Spybar Chicago operations, with the sole exception of the liquor license issued by the State of Illinois, which is held by Skyline. This liquor license allows Spybar to sell alcoholic drinks to its patrons, which sales generate most of its revenue

Spybar Chicago is now known throughout the country and the around the world as a showcase for both renowned and up-and-coming musical performers in the house, techno, and EDM genres. Prior to 2008, Spybar Chicago was only an underground bar which played electronic music; Dino Gardiakos and Garrett Belschner, through Spybar, oversaw a total remodeling of the

space which added capacity and brought River North an underground credibility that has grew over the intervening 10 years. Spybar Chicago has appeared in multiple 'Best of' lists as a "top 100 Club' in the world, including Rolling Stone, DJ Mag., and Resident Advisor and other trade periodicals, despite Spybar Chicago being one of the smaller clubs in that genre with a 300-person capacity. Spybar has been leading the way in developing new and exciting talent, as well as enriching dance music culture in the city for over 10 years, and Spybar Chicago has laid the groundwork for the thriving club scene in the near north side today. Spybar has also partners with local government and business to organize music festivals locally in Chicago, as well as Miami and Detroit, adding to the robust music scene and bringing additional tax revenues to those communities, while raising the prestige of the Chicago club scene.

On September 18, 2013, the Debtor entered into a U.S. Small Business Administration Note and Security Agreement with Ridgestone Bank in the amount of $1,000,000.00 (the "**Loan Agreement**"). On October 14, 2016 Ridgestone Bank and Byline Bank executed a merger agreement under which Ridgestone Bank continued under the charter of Byline Bank ("**Byline Bank**"). Under the terms of the Loan Agreement, the Debtor granted Ridgestone Bank a security interest in certain of the Debtor's personal property, specifically including, equipment, fixtures, inventory, goods, accounts, instruments, chattel paper, and general intangibles and the products and proceeds of the foregoing. On or about August 29, 2018, Byline Bank filed a Verified Complaint for Replevin and Other Relief in the Circuit Court of Cook County, Illinois *styled Byline Bank v. Spybar Management, LLC, et al.*, Case No. 2018L050529 (the "**Replevin Action**"). In its verified complaint, Byline alleges that the Debtor defaulted on its obligations under the Loan Agreement on March 1, 2018 and that Byline Bank was owed as of August 28, 2018 a balance of $423,043.16, with interest accruing at a per diem rate of $86.93. The Debtor was unable to reach an accord with Byline Bank as to the repayment of the obligations owed under the Loan Agreement and was forced to restructure its obligations under the Bankruptcy Code.

In July 2019 the Debtor received information with respect to certain prepetition corporate distributions or disbursements in the approximate aggregate amount of $70,000.00 which were made in 2017 for the benefit or at the direction of Dino Gardiakos, one of the Debtor's members, which have not been classified as of yet for income tax purposes. The Debtor is looking into these disbursements, and to the extent they are deemed to have been unauthorized, or may otherwise give rise to a Cause of Action, those rights are preserved within the Plan for the benefit of the Reorganized Debtor and the Bankruptcy Estate. While the Plan explicitly retains any resulting Causes of Action, the successful implementation of the Plan is not dependent upon liquidating any such claim

## B.    The Debtor's Prepetition Capital Structure.

The Debtor's sole secured creditor is Byline Bank which holds a claim of $485,708.95 accruing interest at a variable rate of Prime + 2.5% (the "**Byline Claim**"). The Byline Claim is secured by the Debtor's equipment, fixtures, inventory, goods, accounts, instruments, chattel paper, and general intangibles. The claim of Byline Bank is the only claim secured by estate property. The largest general unsecured creditor is Garret Belschner, an insider of the Debtor, who holds a claim of $150,000.00. The largest non-insider creditor is Brian Franzen. The Debtor is current with its post-petition federal and state taxes.

**C.      Notable Assets of the Debtor.**

The following is a summary of the Debtor's assets as of the Petition Date:

- Real Estate – The Debtor sublets the space from which it operates within 303 W. Erie, Chicago, Illinois from Skyline.  The Debtor's lease will expire December 31, 2032.

- Vehicles - The Debtor does not hold legal title to any vehicles.

- Accounts Receivable – The Debtor does not have any Accounts Receivable.

- Liquidated Debts Owed to Debtor - None.

- Operating Accounts – The Debtor holds an account with Gold Coast Bank which at the time of filing was subject to levy by the Illinois Department of Revenue, but which was released post-petition.

- Intellectual Property Rights – The Debtor maintains the website www.spybarchicago.com and has a license for use of the "Spybar" trademarks.

- Machinery and Equipment – The Debtor has certain equipment necessary for its continued operations as a nightclub and bar including Pioneer audio equipment, turntables, mixers, projectors, amplifiers, and speakers.

- Inventory – The Debtor's inventory is limited to alcoholic and nonalcoholic beverages for resale to its patrons.

- Contingent Claims – None.

- Operating Reports – The Debtor has filed post-petition operating reports for the months February 2019 through June 2019.  A summary of the Debtor's post-petition operating reports can be found in Section IV.G *infra*.

**D.      Management of the Debtor.**

Management of the Debtor is comprised of the following persons:

| Name | Position |
|------|----------|
| Garrett Belschner | Managing Member |
| Dino Gardiakos | Managing Member |
| Michael Roche | Director of Operations |

**E.      Ownership of the Debtor.**

Ownership of the Debtor is held by the following persons:

| Name | Ownership Interest |
|------|-------------------|
| Garrett Belschner | 50% |
| Dino Gardiakos | 50% |

## IV. EVENTS DURING THE CHAPTER 11 CASE

### A.    Continuation of Business After the Petition Date.
### A.1.    First Day Motions

Shortly after the Petition Date, the Debtor Filed a number of motions with the Bankruptcy Court, seeking various forms of relief, including, without limitation, the following motions, all of which were approved by the Bankruptcy Court:

(a)    Motion for Use of Cash Collateral [Docket No. 6].  By this motion, the Debtor sought entry of an order allowing its use of the cash collateral of Byline Bank and the Illinois Department of Revenue under Bankruptcy Code Section 363.  In its motion, the Debtor noted that use of cash collateral was essential to the Debtor's post-petition operations.  On February 28, 2019, the Bankruptcy Court granted the Debtor's Motion for Use of Cash Collateral on an interim basis, and on April 18,2019, the Bankruptcy Court granted the Debtor's Motion for Use of Cash Collateral on a final basis.

(b)    Motion to Authorize the Debtor to Pay Prepetition Employee Obligations and Prepetition Withholding Obligations [Docket No. 7].  In this motion, the Debtor noted that it employed approximately thirty-two (32) employees, all of which are part time hourly or temporary workers.  With the motion and in order to enable the Debtor to maintain morale during this critical time, retain its current employees, and minimize the personal hardship such employees may suffer if prepetition employee-related obligations were not paid when due or honored as expected, the Debtor sought authority, in its discretion, to pay and honor, as the case may be, all prepetition claims of its employees, including, but not limited to, claims for wages and salaries, vacation days, paid personal time off, and certain costs and disbursements related to the foregoing up to the statutory priority cap of $12,850.00 per employee.  The Bankruptcy Court granted the Debtor's Motion to Authorize Payment of Prepetition Employee Obligations and Prepetition Withholding Obligations on February 28, 2019.

### A.2. Subsequent Motions

Following the Petition Date, the Debtor filed other motions with the Bankruptcy Court seeking additional relief to enable to operate efficiently while a debtor-in-possession:

(a)    Motion to Authorize the Debtor to Continue Making Installment payments to the Illinois Department of Revenue for past due sales tax liability through its affiliate, Skyline Management Co. [Docket No. 20].  The Debtor owns or controls all of the assets necessary for Spybar Chicago's operations, with the sole exception of the liquor license held by Skyline Management Co.  In order to renew the liquor license, in early 2018, Skyline Management Co

negotiated an installment payment plan with the Illinois Department of Revenue.  In conjunction with payment plan, the Debtor whose liquor sales generated the underlying tax liability and as the only entity that produces revenue agreed to indemnify Skyline Management Co. for its obligations to the Illinois Department of Revenue.  Soon after the installment plan was accepted by the Illinois Department of Revenue, the liquor license was renewed.  The Bankruptcy Court granted the Debtor's Motion to Authorize the Debtor to Continue Making Installment payments to the Illinois Department of Revenue on March 14, 2019.  [Docket No. 33].

(b)  Motion to Authorize Maintenance of Bank Accounts and Continued Use of Existing Business Forms.  [Docket No. 45].  Through this motion the Debtor requested authority to maintain its exiting depository account at Gold Coast Bank due to, among other factors, the geographic convivence of the bank and low cost and speed by which Gold Coast Bank issues cashier's checks.  The Bankruptcy Court granted the Debtor's Authorize Maintenance of Bank Accounts on April 3, 2019.  [Docket No. 47].

(c)  Motion to Amend Order Authorizing the Debtor to Continue Making Installment payments to the Illinois Department of Revenue.  [Docket No. 55].  After entry of the order authorizing the Debtor's payment to the Illinois Department of Revenue on account of the liquor license obligations owed by Skyline Management Co., the Debtor became aware that Skyline Management Co. also owed an obligation to the Illinois Liquor Control Commission.  On May 23, 2019 the Bankruptcy Court granted the motion authorizing payment to the Illinois Liquor Control Commission.  [Docket No. 56].

## B.     Employment and Retention of Advisors.

Prior to filing its voluntary chapter 11 petition, the Debtor retained certain professionals to assist it in carrying out its duties as debtor in possession and to otherwise represent its interest in the chapter 11 cases.  These Professionals included Gensburg Calandriello & Kanter, P.C. as counsel for the Debtor.  On March 14, 2019, the Debtor filed its Application to Employ the law firm of Gensburg Calandriello & Kanter, P.C. as its Counsel of Record.  [Docket No. 27]  On March 21, 2019 the Bankruptcy Court entered an order approving Gensburg Calandriello & Kanter as counsel for the Debtor.  [Docket No. 42]  The Debtor also employs James Passarelli and Passarelli-Statewide Ltd. as its ordinary course accountants for the purpose of generating tax returns.

## C.     Monthly and Quarterly Professional Fee Applications.

Gensburg Calandriello & Kanter, P.C. has filed its First Interim Application for Compensation for the time period February 27, 2019 through June 30, 2019.  By this First Interim Application, Gensburg Calandriello & Kanter, P.C. seeks allowance of $67,933.50 for services rendered and actual, necessary expenses in the amount of $1,285.00 for a total allowance of $69,218.50.

**D.      The Debtor's Schedules and SOFA.**

Section 521 of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules require the Debtor to prepare and File Schedules and SOFAs with the Bankruptcy Court. On March 20, 2019, the Debtor Filed its Schedules and SOFA. [Docket No. 39].

**E.      Exclusivity**

On March 18, 2019 the Bankruptcy Court entered an order requiring the Debtor to file its Plan and Disclosure Statement on or before June 27, 2019. Section 1121(e) of the Bankruptcy Code establishes an initial period of 180 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code during which only the debtor may file a plan. Section 1121(e) of the Bankruptcy Code permits a bankruptcy court to extend these exclusivity periods if it is able to demonstrated by a preponderance of the evidence that it is more likely than not a plan will be confirmed within a reasonable amount of time. The Debtor has not requested an extension of the exclusivity period and exclusivity for the above captioned case will expire on August 26, 2019.

**F.      Post-Petition Operations.**

The Debtor has continued its post petitions operations pursuant to the authority bestowed upon it by the Bankruptcy Court. As reflected in its Monthly Operating Reports, the Debtor remains current on its position petition obligations and has started to accumulate cash to enable its restructuring.

•      Utilities - Debtor is current in its post-petition payment of electric, water, and telecommunication services.

•      Insurance - Debtor is current in its payment of insurance.

•      Taxes - Debtor is current with respect to the filing of both State and Federal post-petition tax returns and payment of both State and Federal post-petition taxes.

•      Accounting Services – The Debtor employs James Passarelli and Passarelli-Statewide Ltd. as ordinary course accountants. The Debtor has not retained an accounting professional under section 327 of the Bankruptcy Code.

•      Adversary Proceedings - The Debtor is not a party to any adversary proceedings.

•      Place of Operations - The Debtor currently conducts its business at 303 E. Erie, Chicago, Illinois and the Debtor will continue to conduct business at this location for the indeterminate future.

### G.    Monthly Operating Reports.

Section 586(a)(3) of Title 28 of the United States Code, directs the Office of the United States Trustee to supervise the administration of all Chapter 11 cases. To comply with this charge, the Office of the United States Trustee has established operating guidelines and reporting requirements for Chapter 11 debtors and trustees. One of the requirements is that Chapter 11 debtors must file monthly operating reports with the clerk of the Bankruptcy Court. Monthly Operating Reports include an income statement, balance sheet, and cash receipts and disbursements activity detail. Monthly Operating Reports also include select operating and financial data including, among others: accounts receivable detail and/or aging's; accounts payable detail and/or aging's; taxes paid and payable detail. As of the date of the filing of this Disclosure Statement, the Debtor filed three monthly operating reports. The Monthly Operating Reports filed by the Debtor with the clerk of the Bankruptcy Court can be found as Docket Numbers 53, 54, 57, 62, and 65. A summary of the receipts, disbursement and net receipt/disbursement data, by month, is as follows:

| Period Ending | Total Receipts | Total Disbursements | Net Receipts |
|---|---|---|---|
| February 28, 2019 | $0.00 | $0.00 | $0.00 |
| March 31, 2019 | $209,188.13 | $149,980.46 | $59,745.17 |
| April 30, 2019 | $214,409.70 | $202,122.70 | $12,287.00 |
| May 31, 2019 | $187,843.55 | $205,438.70 | $(17,595.15) |
| June 30, 2019 | $217,026.65 | $208,983.83 | $8,042.82 |

## V. SUMMARY OF THE PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classifications and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan. The purpose of the Plan is to fairly and expeditiously provide distributions to the holders of Allowed Claims during the reorganization of the Debtor.

### A.    Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor can reorganize (i.e. restructure its debts) or wind-down its business for the benefit of itself and holders of claims against and interests in the debtor. Chapter 11 also is designed to promote equality of treatment for similarly situated holders of claims against the debtor and similarly situated holders of interests in the debtor with respect to the distribution of the debtor's assets. The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Confirmation of a Chapter 11 plan is the principal means available to the Debtor to achieve its objective, namely a successful reorganization. A Chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a Chapter 11 plan by a bankruptcy court makes the plan binding upon the debtor, any person or entity acquiring property

under the plan and any holder of claims against or interests in the debtor, whether or not such holder of claims or interests (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges a corporate debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therewith the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by provisions of the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, the Debtor needs not solicit votes from the Holders of Claims or Equity Interests in such classes.  A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor.  Such classes are deemed to be impaired and will be solicited to vote to accept or reject the Plan.  Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the Plan.

Section 1123 of the Bankruptcy Code provides that a Chapter 11 plan shall classify claims against and interests in the debtor.  In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class.  The Debtor also is required, as discussed above, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes.  The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Equity Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, the Debtor intends, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

## B.     Claims and Bar Dates.
### B.1.    Bar Dates.

On March 20, 2019 the Debtor filed its schedules of assets and liabilities and statement of financial affairs (collectively, the "**Schedules**") with the Bankruptcy Court.  Interested parties may review the Schedules at the office of the Clerk of the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, 219 S. Dearborn St., Chicago, Illinois.

On March 14, 2019 the Bankruptcy Court entered an order pursuant to Bankruptcy Rule 3003(c)(3) setting (a) April 28, 2019 as the date by which all Entities (except Governmental Units) are required to file Proofs of Claim for prepetition Claims; and (b) August 26, 2019 as the date by which Governmental Units are required to file Proofs of Claim for prepetition Claims.  In

accordance with the Bar Date Order, written notice of the various Bar Dates was mailed to all holders of Claims listed on Debtor's Schedules.

## B.2.    Claims.

The Debtor estimates that, at the conclusion of the Claims objections, reconciliation, and resolution process, the aggregate amount of Allowed Claims will be as follows: 1) Allowed Administrative Claims in the approximate total amount of $81,000.00; 2) Allowed Priority Tax Claims in the approximate total amount of $331,551.87; 3) Allowed Secured Claims in the approximate total amount of $485,708.95; 4) Allowed Unsecured Claims entitled to Priority in the approximate total amount of $26,641.23; 5) Allowed General Unsecured Claims in the total approximate amount of $231926.78; and 6) Allowed Unsecured Claims held by Insiders in the total approximate amount of $285,000.00.

## B.3.    Objections to Claims.

The Debtor shall have the right to object to claims for 120 days after confirmation of the Plan, or if a Proof of Claim is filed after an Order of Confirmation is entered by the Court then for 120 days after the filing of the Proof of Claim.

## C.    Administrative Expense Claims.

In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Expense Claim, each Holder thereof shall be paid in full in Cash (a) on the Effective Date or as soon as reasonably practicable thereafter, (b) if such Claim is Allowed after the Effective Date, on or as soon as reasonably practicable after such Claim is Allowed, or (c) upon such other terms as may be agreed upon by such Holder of the Claim.   Administrative Expense Claims include: (i) those actual and necessary expenses of preserving the estate and actual and necessary expenses of operating the Debtor's business from and after commencement of the bankruptcy proceeding; (ii) claims held by court appointed professionals including ;Gensburg Calandriello & Kanter, P.C.; and (iii) tax claims entitled to priority by Section 503(b) or 507(a)(8) of the Bankruptcy Code.

All final requests for payment of Claims of a Professional shall be filed no later than thirty days after the Effective Date. Any objections to final requests for payment of Claims of a Professional shall be filed no later than sixty days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

Two creditors hold tax claims entitled to priority by Section 503(b) or 507(a)(8) of the Bankruptcy Code: the Illinois Department of Revenue ("**IDOR**") and the Department of Treasury-Internal Revenue Service ("**IRS**").  IDOR filed two proofs of claim, numbers 2-1 and 3-1, with an aggregate claim entitled to priority of $30,586.18.  Proof of Claim 2-1 was filed in the amount of $591.75 and appears to reference a non-debtor federal Tax ID.  The Debtor intends to object to The IRS filed proof of claim 7-1 with a priority claim of $297,052.94 and the Debtor intends to

object to proof of claim 7-1 as it is premised almost entirely upon estimated tax liabilities and the Debtor believes the true value of the claim held by the IRS to be significantly less than that set forth in proof of claim 7-1.

Entry of a Confirmation Order will operate as an injunction against the commencement or continuation of an action, the employment of process, or any act to collect, recover or offset any Claim of IDOR of the IRS against the Garrett Belschner or Dino Gardiakos, and said injunction shall be effective so long as the Reorganized Debtor is performing its obligations under the Plan, and no Default has occurred and remains uncured.

### D.    Classification and Treatment of Claims and Equity Interests.

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a Chapter 11 plan must categorize claims against and equity interests in a debtor into individual classes.  Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, Section 1122 of the Bankruptcy Code dictates that a Chapter 11 plan may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.  The Plan creates several "Classes" of Claims and Equity Interests which take into account the differing nature and priority of Claims against and Equity Interests in the Debtor.

A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  The Plan provides specific treatment for each Class of Claims or Equity Interests.  Only Holders of Allowed Claims or Allowed Equity Interests are entitled to vote on and receive Distributions under the Plan.  Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Equity Interest.  The categories of Claims and Equity Interests and their treatment listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and Distribution pursuant to the Plan, except as otherwise provided herein or in the Plan, and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

### D.1.    Class I – Allowed Secured Claim of Byline Bank.

Allowed Class I Claims include the Allowed Secured Claim of Byline Bank.  On March 25, 2019 Byline Bank filed proof of claim No. 4-1 in the amount of $485,708.95.  The basis for Byline Bank's claim is a Variable Rate Installment Note which will mature on September 2023 and which is secured by the Debtor's equipment, fixtures, inventory, goods, accounts, instruments, chattel paper, and general intangibles.  Debtor's Plan calls for the repayment of the balance due on the note with 7.5% interest per annum.  Entry of a Confirmation Order will operate as an injunction against the commencement or continuation of an action, the employment of process, or any act to collect, recover or offset any Claim of Byline against the Garrett Belschner or Dino Gardiakos,

and said injunction shall be effective so long as the Reorganized Debtor is performing its obligations under the Plan, and no Default has occurred and remains uncured.

The first payment to Byline Bank shall be made on the first day of the first month that begins no less then twenty-one days after the Effective Date. The Allowed Secured Claim of Byline Bank may be prepaid pursuant to the terms of the Byline Bank loan documents. The Property securing Byline Bank's Class I secured Claim may not be transferred, sold, or refinanced, unless the Byline Bank Allowed Secured Claim is paid in full or with written consent of Byline Bank. In all other respects, the rights and obligations of the Debtor and Byline Bank under their loan documents shall remain the same, including, but not limited to, the security interest of Byline Bank in certain assets of the Debtor.

Class I is impaired and a creditor with a Class I claim is entitled to vote on Debtor's Plan.

**D.2.    Class II – Allowed Unsecured Claims Entitled to Priority by the Bankruptcy Code.**

Allowed Class II Claims include the General Unsecured Claims entitled to Priority under the Bankruptcy Code. Two creditors filed proofs of claim for General Unsecured Claims entitled to Priority: the Illinois Department of Revenue ("**IDOR**") and the Department of Treasury-Internal Revenue Service ("**IRS**"). IDOR filed two proofs of claim, numbers 2-1 and 3-1, with an aggregate claim entitled to priority of $30,586.18. The Debtor intends to object to proof of claim 2-1 as it references a non-debtor's federal Tax ID. The IRS filed proof of claim 7-1 with a priority claim of $297,052.94. The Debtor intents to object to proof of claim 7-1 as it is premised almost entirely upon estimated tax liabilities and the Debtor believes the true value of the claim held by the IRS to be significantly less than that set forth in proof of claim 7-1.

The Debtor does not believe any other proofs of claim for general unsecured claims entitled to priority will be filed; however, Governmental Entities have until August 26, 2019 to file their proofs of claim pursuant to the Claims Bar Date Order of March 14, 2019. All holders of Allowed General Unsecured Claims entitled to Priority will be paid 100% of their claim. The Holders of Allowed Class II Unsecured Claims Entitled to Priority shall receive 100% of their Allowed Priority Claim in sixty (60) equal monthly installments. The first payment shall be made on the first day of the first month that begins no less then twenty-one days after the Effective Date. Subsequent payments shall be made on the first day of each succeeding month thereafter.

Class II is an impaired class and a creditor with a Class II claim is entitled to vote on Debtor's Plan.

**D.3.    Class III – Allowed non-Insider General Unsecured Claims.**

Allowed Class III Claims include the non-Insider General Unsecured Claims. The Debtor estimates there to be approximately $231,926.78 in non-Insider General Unsecured Claims, an amount subject to diminution through election by the Holders of Class III Claims to receive treatment as a Class IV Claim. The holders of Allowed Class III Claims will be paid 100% of their claim in fifty-four (54) equal monthly installments, or pursuant to such other payment plan agreed to by the parties and approved by the Court. The first payment shall be made on the first day of

the sixth month that begins no less then twenty-one days after the Effective Date. Subsequent payments shall be made on the first day of each succeeding month thereafter.

Class III is an impaired class and a creditor with a Class III claim is entitled to vote on Debtor's Plan.

**D.4.  Class IV – Allowed Unsecured Claims of $1,500.00 or less.**

Class IV will consist of Unsecured Claims of a value of $1,500.00 or less, either originally or by election made in writing by a Creditor holding an Unsecured Claim Entitled to Priority or a General Unsecured Claim in excess of $1,500.00 to reduce any such Claim to $1,500.00 through appropriate notation on a ballot accepting or rejecting the Plan, and such an election shall be made no later than the date by which such ballots must be returned as fixed by the Bankruptcy Court. The Debtor estimates the aggregate value of claims within Class IV to be $13,708.72. The Holder of an Allowed Class IV Claim shall receive 100% of its Claim during the first ninety (90) days after the Plan Effective Date, or pursuant to such other payment plan agreed to by the parties and approved by the Court. Funds to pay Class IV claims will be drawn from the income of the Debtor and Reorganized Debtor.

Class IV is an impaired class and a creditor with a Class III claim is entitled to vote on Debtor's Plan.

**D.5.  Class V – Allowed Insider General Unsecured Claims.**

Creditors holding allowed Class V Claims shall receive, on the Effective Date, subordinated promissory notes in the amount of their Allowed Claims. Payment on account of the promissory notes shall be subordinated to the right of payment to all Allowed Class I, II, III, and IV Claims, and for the avoidance of doubt, no payment on account of a subordinated promissory note may be made until all allowed Class I, II, III, and IV Claims have been paid in full. Class V Claims shall not accrue interest

Class V is an impaired class and a creditor with a Class III claim is entitled to vote on Debtor's Plan

**D.5.  Class VI – Equity Interests.**

Equity Interests include all issued, unissued, authorized, or outstanding memberships or other ownership interests of the Debtor, together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto. Certain Pre-Petition Holders of Allowed Equity Interests will maintain an equity interest in the reorganized Debtor in exchange for the release of their Class V Claims, and will receive no cash distribution under the Plan.

**E.      Means for Implementation of the Plan.**
**E.1.    Income Generated from Operation of the Debtor**

The reorganized Debtor will continue to operate as a going concern.  The Debtor estimates that its gross revenues will continue to increase in years 2019 through 2024 and that between $291,216.90 to $444,718.03 will be available annually for plan payments.  The increase in gross revenue will be attributable to efficiencies in the Debtor's operations caused the implementation of payroll services, a relationship with a new online ticketing platform coupled with a decrease cost of talent acquisition through better relationships with talent agencies, and a decrease in professional expenses.

**F.      Assumption or Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, except as otherwise provided herein, each Executory Contract and unexpired lease not previously assumed or assumed and assigned shall be deemed automatically assumed pursuant to Sections 365(a) and 1123 of the Bankruptcy Code, unless such Executory Contract or unexpired lease: (1) is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Executory Contract or unexpired lease as of the Effective Date; or (3) is a contract, instrument, release, or other agreement or document entered into in connection with the Plan.

**F.1.    Approval of Assumption or Rejection of Executory Contracts.**

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article VII of the Plan, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article VII of the Plan, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtor may assume, assume and assign, or reject any unexpired lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease. The assumption by the Debtor of an Executory Contract shall be binding upon any and all parties to such Executory Contract as a matter of law, and each such Executory Contract shall be fully enforceable by the Debtor in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

Any motions to assume Executory Contracts or unexpired leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Notwithstanding anything to the contrary in the Plan, the Debtor reserves the right to alter, amend, modify, or supplement the schedules of Executory Contracts in the Plan Supplement at any time through the Effective Date, and the Debtor may alter, amend, or modify the schedules of Executory Contracts in the Plan Supplement any time as set forth within Article VII of the Plan to reject Executory Contracts previously scheduled for assumption.  In the event the Debtor elects to alter, amend, or modify the schedules of Executory Contracts in the Plan Supplement, it will provide notice to the effected parties.

**F.2.    Cure of Defaults.**

Any Cure Claim under each Executory Contract or unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Debtor's Estate or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claim required by Section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided that prior to the Effective Date, the Debtor may settle any dispute regarding the amount of any Cure Claim without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

**F.3.    Claims under Rejected Executory Contracts and Unexpired Leases.**

Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtor.  With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the after the date the Executory Contract is rejected.  The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

Except if added to the Plan Supplement through an alteration, amendment or modification of the same as provided above, at least twenty-one (21) days before the Confirmation Hearing, the Debtor shall cause notice of proposed assumption and proposed Cure Claims to be sent to applicable counterparties. Any objection by such counterparty must be filed, served and actually received by the Debtor not later than seven (7) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract or unexpired lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim.

Subject to satisfaction of the Cure Claims, the assumption of any Executory Contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or unexpired lease at any time before the effective date of assumption and/or assignment.  Anything in the Schedules and any Proofs of Claim filed with respect to an Executory Contract or unexpired lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

Parties subject to a motion to reject Executory Contract or listed in the Plan Supplement, and not previously rejected, assumed, or assumed and assigned shall be deemed to hold an allowed Class III claim, for voting purposes only, in the amount of $1.00. The temporary allowance of such a claim is for Plan voting purposes only and the Debtor reserves all rights relating to such a claim for all purposes other than voting in connection with the Plan, including, without limitation, with respect to the priority, amount and liability of such claims for purposes of distribution.

**F.4.    Preexisting Obligations Under Executory Contracts and Unexpired Leases.**

Rejection or repudiation of any Executory Contracts or unexpired leases pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor's Estate under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the Debtor from counterparties to rejected or repudiated Executory Contracts or unexpired leases.

**F.5.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each assumed Executory Contract or unexpired lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or unexpired lease, and all Executory Contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and unexpired leases that have been executed by the Debtor or the Debtor's Estate during the Bankruptcy Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**G.    Procedures for Resolving Disputed Claims and Interests.**
**G.1.    Allowance of Claims and Interests.**

After the Effective Date, except as released herein or by Bankruptcy Court Order, the reorganized Debtor shall have and retain any and all rights and defenses that the Debtor had with respect to any Claims and Interests immediately prior to the Effective Date.

**G.2.    Claims and Interests Administration Responsibilities.**

Except as otherwise specifically provided in the Plan, after the Effective Date, the reorganized Debtor shall have the authority: (a) to file, withdraw, or litigate to judgment any objections to Claims or Interests; and (b) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court.

**G.3.    Estimation of Claims and Interests.**

Before the Effective Date, the Debtor, and at any time after the Effective Date, the reorganized Debtor, may (but is not required to) request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the reorganized Debtor, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty days after the date on which such Claim is estimated.

**G.4.    Adjustment to Claims Without Objection.**

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, or altered by court order, may be adjusted or removed from the Claims Register at the request of the reorganized Debtor without any further notice to or action, order, or approval of the Bankruptcy Court.

**ANY CLAIM OR INTEREST, THE HOLDER OF WHICH IS IN RECEIPT OF NOTICE OF THESE PROCEEDINGS, THAT HAS BEEN OR IS HEREAFTER LISTED IN THE SCHEDULES AS CONTINGENT, UNLIQUIDATED OR DISPUTED, AND FOR WHICH NO PROOF OF CLAIM OR INTEREST HAS BEEN TIMELY FILED IS NOT CONSIDERED ALLOWED AND SHALL BE EXPUNGED WITHOUT FURTHER ACTION BY THE DEBTOR AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL BY THE BANKRUPTCY COURT.**

**G.5.    Amendments to Claims.**

On or after the Effective Date, except as provided in Article X of the Plan, a Claim may not be filed or amended without authorization of the Bankruptcy Court and the Reorganized Debtor, and any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

**H.     Distributions.**
**H.1.     Initial Distribution.**

On the Effective Date, or as soon as reasonably practicable (as determined by the Debtor) after the Effective Date, the Debtor shall make the distributions required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals) and Allowed Claims in Classes I, II, and IV.  Thereafter, the Debtor shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of the Plan.

For purposes of this Plan, an "Allowed Claim" refers to a Claim or that portion of a Claim which is not a claim subject to a bone fide dispute or which has been disallowed by the Court and (a) as to which a Proof of Claim was filed on or before the Bar, or, by order of the Bankruptcy Court, was not required to be so filed, or (b) as to which no Proof of Claim was filed on or before the Bar Date but which has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent and, in the case of subparagraph (a) and (b) above, as to which either (i) no objection to the allowance of such Claim has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, or (ii) any objection as to the allowance of such Claim has been settled or withdrawn or has been overruled by a Final Order.  "Allowed Claim" shall also include a Claim that is allowed by the Bankruptcy Court in a Final Order. "Allowed", when used as an adjective herein (such as Allowed Administrative Expense Claim, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, and Allowed Unsecured Claim), has a corresponding meaning.

For purposes of this Plan, a "Disputed Claim" refers to a Claim or portion thereof (other than a Disallowed Claim) that is not an Allowed Claim and (a) as to which a Proof of Claim has been filed or is deemed filed under applicable law or order of the Bankruptcy Court, or (b) which has been scheduled in the Schedules and, in the case of subparagraph (a) and (b) above, as to which an objection has been timely filed or deemed filed under the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, and any such objection has not been (i) withdrawn, (ii) overruled by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the amount subject to objection.  "Disputed", when used as an adjective herein (such as Disputed Administrative Expense Claim, Disputed Priority Tax Claim, Disputed Priority Claim, Disputed Secured Claim, and Disputed Unsecured Claim), has a corresponding meaning.

**H.2.     Distributions as to Allowed Claims in Classes V.**

Within twenty-one (21) days of the Effective Date the Reorganized Debtor shall execute and provide to the holders of Allowed Class V Claims promissory notes in the amount of the Allowed Class V Claims.  Promissory notes issued on account of Allowed Class V Claims shall be subordinate to Allowed Class I, II, III, and IV Claims. For the avoidance of doubt, and notwithstanding any provision herein to the contrary, no payment on account of a subordinated

promissory note may be made until all Holders of Allowed Class I, II, III, and IV Claims have received 100% of their Allowed Claims.

### H.3.   Compliance with Tax Requirements.

In connection with the Plan, the Debtor shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations on account of such Distribution.

### I.   Exculpation from Liability, Release, and General Injunction.
### I.1.   Exculpation from Liability.

The Debtor and its postpetition officers and directors and the Professionals for the Debtor (acting in such capacity), (collectively, the "**Exculpated Parties**") shall neither have nor incur any liability whatsoever to any Person or entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Case, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. The rights granted under Section 8.04 of the Plan are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase of securities. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of Section 8.04 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

### I.2.   Release.

On the Effective Date, the Debtor and any and all Holders of Claims and Equity Interests shall release unconditionally and hereby are deemed to release unconditionally the Debtor's bankruptcy estate (collectively, the "**Released Parties**") from any and all claims, obligations, suits, judgments, damages, losses, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place between the Petition Date and the Effective Date, which is

in any way relating to the Debtor, the Bankruptcy Case, any Property of the Debtor, the business or operations of the Debtor, any Plan Documents, the Plan, or any of the transactions contemplated thereby; provided, however, that this release provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party.  Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy.  The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Released Parties, except as otherwise provided in the Plan or in the Confirmation Order.  Each of the Released Parties shall have the right to independently seek enforcement of this release provision.  This release provision is an integral part of the Plan and is essential to its implementation.  Notwithstanding anything to the contrary contained herein, the provisions of Section 8.05 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

### I.3.   General Injunction.

Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all persons or entities that have held, currently hold or may hold a Claim, Debt, Liability, or Equity Interest that is treated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, Liabilities, or Equity Interests other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents: (a) commencing or continuing in any manner any action or other proceeding against the Debtor or its Property; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor or its Property; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtor or its Property; (d) asserting a setoff, right of subrogation or recoupment of any kind not provided for in the Plan against any debt, liability or obligation due to the Debtor; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtor under the Plan and the Plan Documents.  The Debtor shall have the right to independently seek enforcement of this general injunction provision.  This general injunction provision is an integral part of the Plan and is essential to its implementation.  Notwithstanding anything to the contrary contained herein, the provisions of this Section 11.4 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

### I.4.   Term of Certain Injunctions and Automatic Stay.

All injunctions for the benefit of the Debtor pursuant to Section 105 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Case, and in existence on the Confirmation Date, and the automatic stay pursuant to Section 362 of the

Bankruptcy Code shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

**I.5.    Guarantor Injunction.**

Pursuant to Sections 105 and 1123, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, the order of Plan confirmation shall, as of the Effective Date and except as otherwise expressly provided in the Plan or in the Confirmation Order, operate as an injunction against the commencement or continuation of an action, the employment of process, or any act to collect, recover or offset any Claim of any Holder against the Garrett Belschner or Dino Gardiakos.   The injunction provided for under Plan section 8.07 shall be effective so long as the Reorganized Debtor is performing its obligations under the Plan, and no Default has occurred and remains uncured.   This injunction from collection against the guarantors is an integral part of the Plan and is essential to its implementation.

## VI. GENERAL INFORMATION ON VOTING AND CONFIRMATION PROCEDURE

**A.    Purpose of Disclosure Statement.**

The Disclosure Statement is generally provided to all Holders of Claims and Equity Interests entitled to vote upon the Plan pursuant to Section 1125 of the Bankruptcy Code to enable such Holders to make an informed decision concerning the Debtor's solicitation of acceptances of the Plan.   After notice and a hearing conducted on _____, 2019 by order dated _____, 2019, the Bankruptcy Court approved this Disclosure Statement as containing "adequate information" (as defined in section 1125(a) of the Bankruptcy Code) of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the Holders of Claims against or Equity Interests in the Debtor to make an informed decision in voting to accept or reject the Plan. Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation to accept or reject the Plan.

**B.    Voting on the Plan.**

The following is a summary of the procedures and requirements that have been established for voting on the Plan.   If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan.   If you hold Claims in more than one Class and you are entitled to vote such Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims.   If you are entitled to vote and did not receive a Ballot, or you received a damaged Ballot, or you lost your Ballot, please contact Debtor's counsel by one of these methods: (a) by telephone at (312) 263-2200; (b) by sending an email to pgroben@gcklegal.com; (c) by requesting a Ballot by first-class  mail, hand delivery, courier service or overnight mail to Spybar Ballot Processing, c/o Gensburg Calandriello & Kanter, P.C., 200 W. Adams St., Ste. 2425, Chicago, IL 60604.

Votes cannot be transmitted orally, by facsimile or by electronic mail (e-mail). Accordingly, you are urged to return your signed and completed Ballot promptly.   Any executed

Ballot that does not indicate either an acceptance or a rejection of the Plan, or that indicates both an acceptance and a rejection of the Plan, will not be counted as a vote to either accept or reject the Plan.

THE DEBTOR RESERVES THE RIGHT TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE IN THE EVENT ANY OF THE VOTING CLASSES VOTE TO REJECT THE PLAN, AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

SUBJECT TO THE TERMS AND CONDITIONS OF THE PLAN, THE DEBTOR RESERVES THE RIGHT TO AMEND THE PLAN EITHER BEFORE OR AFTER THE PETITION DATE.

AMENDMENTS TO THE PLAN THAT DO NOT MATERIALLY AND ADVERSELY AFFECT THE TREATMENT OF CLAIMS OR EQUITY INTERESTS MAY BE APPROVED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING WITHOUT THE NECESSITY OF RESOLICITING VOTES.  IN THE EVENT RESOLICITATION IS REQUIRED, THE DEBTOR WILL FURNISH NEW BALLOTS TO BE USED TO VOTE TO ACCEPT OR REJECT THE PLAN, AS AMENDED.

## B.1.    Who May Vote.

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims or Equity Interests in Classes that are Impaired by, and are receiving Distributions under, the Plan may vote on the Plan.  Holders of Claims that are Unimpaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.  Administrative Claims and Priority Tax Claims are not generally classified for purposes of voting or receiving Distributions under the Plan.

In this case, Holders of Claims in Classes I, II, III, IV, and V are entitled to vote to accept or reject the Plan.  If you are entitled to vote to accept or reject the Plan, a Ballot has been enclosed for the purpose of voting.

## B.2.    Eligibility.

In order to vote to accept or reject the Plan, a Holder of an Allowed Claim must have timely Filed or been assigned a timely Filed proof of claim, unless its Claim is listed on the Debtor's Schedules and is not identified therein as disputed, unliquidated or contingent or has not been objected to prior to the Confirmation Hearing.  Creditors or Holders of Equity Interests having an Allowed Claim or Allowed Equity Interest in more than one Class may vote in each Class in which they hold a separate Claim or Equity Interest by casting a Ballot in each Class.

## B.3.    Binding Effect.

Whether a Holder of an Allowed Claim or Allowed Equity Interest votes on the Plan or not, such Holder shall be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy

Court.  Unless a Ballot is completed and returned in accordance with approved Bankruptcy Court procedures, a Holder of an Allowed Claim that submits a vote on the Plan shall not be counted for purposes of determining the amount and number of Creditors voting on the Plan.

## C.      Procedure/Voting Deadlines.

In order for your vote to be counted, you must complete, date, sign and properly mail or deliver the enclosed Ballot via hand delivery, courier service, overnight mail, or first-class mail so that it is received on or before the Voting Deadline, 5:00 p.m. (prevailing Central Time) on _____ _____, 2019, to the following address:

> US Bankruptcy Court
> Eastern Division
> 219 S. Dearborn
> Chicago, IL 60604

Facsimile or electronically submitted Ballots will not be counted.

Once you have delivered your Ballot to the Clerk of Court, you may change your vote by submitting to the Clerk of Court a valid subsequent Ballot to be received by the Voting Deadline. You may not, however, change your vote after the Voting Deadline, except upon cause shown to the Bankruptcy Court after notice and a hearing or upon the agreement of the Debtor.

Please be sure to complete the Ballot properly and legibly, identifying the exact amount of your Claim, the Class or Classes in which the Claim(s) or Equity Interest(s) is/are classified under the Plan and the name of the Creditor.

## D.      Plan Confirmation Process.

The requirements for confirmation of the Plan are set forth in detail in section 1129 of the Bankruptcy Code.  The following summarizes some of the pertinent requirements:

### D.1.   Acceptance by All Impaired Classes:

Except as noted below, each Impaired Class of Claims must vote to either accept the Plan or be deemed to accept the Plan. "Impaired" is defined in section 1124 of the Bankruptcy Code. A Claim is Impaired unless the Plan leaves unaltered the legal, equitable, or contractual rights of the Holder.  Under the Plan, Claims in Class I, Class II, Class III, Class IV, and Class V are Impaired.  Holders of Claims in Class I, Class II, Class III, Class IV, and Class V and Equity Interests in Class VI are entitled to vote, separately, to accept or reject the Plan.

As a voting Creditor or Equity Interest Holder, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, Creditors holding a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan.  At least one Impaired Class of Creditors, excluding the votes of Insiders (if any), must actually vote to accept the Plan.

**D.2.    Feasibility**:

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan (unless such liquidation or reorganization is proposed in the Plan).   In addition, section 1129(a)(13) requires that all fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.   These conditions are often referred to as the "feasibility" of the Plan.

The Plan Distribution Analysis presents estimates of the proceeds that would be available for distribution to creditors if the Plan were confirmed and effectuated according to its terms. These estimates represent a range of management's assumptions regarding the costs that would be incurred to implement the Plan and the funds that would be available for distribution to creditors.

The Debtor has filed operating reports for the post-petition portion of February 2019 through June 2019, copies of which are can be obtained through the Case Docket or by request from Debtor's counsel.   The monthly operating reports show average monthly net receipts from operations of $12,495.97.

Debtor anticipates total monthly gross revenues and annualized funds available for plan payments in the following sums: $291,216.90 in Year 1, $320,448.57 in Year 2, $329,114.47 in Year 3, $386,762.56 in Year 4, and $444,718.03 in Year 5.   Detailed projected Plan payments are set forth in **Exhibit B**, attached hereto.   The Debtor's consolidated financials for the year 2017, the last year for which such reports are available, are attached hereto as **Exhibit C**.   Debtor projects that, after the validity and amount of all secured and priority claims are settled or adjudicated, the amounts set forth above will be sufficient to satisfy the payment requirements set forth in its plan.

PLAN DISTRIBUTION ANALYSIS

| Class | Total Claims $ | Recovery $ | Recovery % |
|---|---|---|---|
| Administrative and Priority Claims | $30,000 | $30,000 | 100% |
| Class I – Secured Claim of Byline Bank | $485,708.95 | $563,406.60 | 115% |
| Class II – Priority Claims | $358,193.10[2] | $358,193.10 | 100% |
| Class III – General Unsecured Claims | $231,926.78 | $231,926.78 | 100% |
| Class IV – Unsecured Claims < $1,500.00 | $13,708.72 | $13,708.72 | 100% |
| Class V – Insider Unsecured Claims | $250,000.00 | $0.00 | 0% |
| Class VI – Equity Interests | Unknown | Unknown | Unknown |
| TOTAL | $1,355,828.83 | $1,183,526.48 | |

The debtor believes that any analysis of hypothetical plan distributions is necessarily speculative.   There are a number of estimates and assumptions underlying these estimates that are inherently subject to significant legal, economic, competitive, and operational uncertainties and contingencies beyond the control of the debtor.   Neither the estimated plan distributions, nor the

---

[2] Claim size subject to objection, see Section V.D.2. *supra.*

financial information on which it is based, has been examined or reviewed by independent accountants or prepared in accordance with standards promulgated by the American Institute of Certified Public Accountants. There can be no assurance that actual results will not vary materially from the hypothetical results presented in the plan distribution analysis.

Accordingly, the Debtor believes that the Plan satisfies the requirements of feasibility under section 1129(a) of the Bankruptcy Code.

### D.3.    "Best Interests" Test.

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court must find that the Plan is in the best interests of Creditors (commonly referred to as the "Best Interests" test). To satisfy the "Best Interests" test, the Bankruptcy Court must determine that each Holder of an Impaired Claim either: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such Holder would receive if the Debtor's property was liquidated under Chapter 7 of the Bankruptcy Code on that date.

### D.4.    Costs and Expenses of Liquidation.

In Chapter 7 liquidation, a trustee in bankruptcy would be appointed. The Debtor's business likely would not be operated by the Chapter 7 trustee, and the trustee would likely liquidate the Debtor's assets on a piecemeal basis. The net amount generated from the liquidation of the Debtor's remaining assets would be reduced by the administrative expenses of both the Chapter 7 case and the Bankruptcy Case, including the fees and commissions of the Chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the Chapter 7 trustee, in addition to unpaid expenses incurred by the Debtor during the Bankruptcy Case. These expenses and costs would reduce the net proceeds available to Holders of Allowed Claims or Allowed Equity Interests.

Any remaining net cash would be allocated to creditors and stockholders in strict accordance with the priorities set forth in Section 726 of the Bankruptcy Code. The present value of such allocation of the hypothetical liquidation proceeds (after deducting the amounts described above) is then compared with the present value of the proposed Distributions under the Plan to each of the Classes of Claims and Equity Interests to determine if the Plan is in the best interests of each Creditor or Holder of an Equity Interest. If the present value of the Distributions available to unsecured creditors under the hypothetical liquidation is less than or equal to the present value of the Distributions available to unsecured creditors under the Plan, then the Plan is in the best interests of creditors and can be considered in the "best interests of creditors" by the Bankruptcy Court.

### D.5.    The Plan Meets the Best Interests Test.

The Debtor believes that the Plan will produce a recovery for Holders of Claims and Equity Interests that would be equal to or better than would be achieved in Chapter 7 liquidation. The Bankruptcy Court must accept the Debtor's Liquidation Analysis or independently (a) estimate the

Cash proceeds (the "**Liquidation Proceeds**") that a Chapter 7 trustee would generate if a Chapter 11 Case was converted to a Chapter 7 case and the assets of such estate were liquidated, (b) determine the distribution ("**Liquidation Distribution**") that each non-accepting Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in Chapter 7, and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan ("**Plan Distribution**") that such Holder would receive if the Plan were Confirmed and consummated. Liquidation values for non-cash personal property were estimated to be one third of the fair market value for said property. The Debtor believes one third is an appropriate discount for the non-cash personal property considering the type and condition of said property, and a liquidation analysis is included below:

| Item | FMV | Liquidation value |
|---|---|---|
| Real Property | $0.00 | $0.00 |
| Personal Property | | |
| - Cash | $41,640.44 | $41,640.44 |
| - Accounts Receivable | $0.00 | $0.00 |
| - Intellectual Property | $0.00 | $0.00 |
| - Office Furniture/Equipment | $2,500.00 | $833.25 |
| - Inventory | $7,000.00 | $0.00[3] |
| - Office/Sound Equipment | $45,500.00 | $15,166.52 |
| - Causes of Action | $Unknown | $Unknown |
| TOTAL FAIR MARKET VALUE | $96,640.44 | |

### **TOTAL LIQUIDATION VALUE OF DEBTOR'S ASSETS    $57,640.21**

The following Secured Claims and Administrative Priority Claims, and Allowed Priority Claims that would need to be satisfied before any funds would be paid to unsecured creditors:

| Claimant | FMV Amount | Liquidation Amount |
|---|---|---|
| Total Value of Debtor's Assets | $96,640.44 | $57,640.21 |
| Expected Administrative Claims | $30,000.00 | $30,000.00 |
| Funds Available for Secured Claims | $66,640.44 | $27,640.21 |
| Secured Claims | $485,708.95 | $485,708.95 |
| Funds Available for Priority Claims | $0.00 | $0.00 |
| Priority Claims | $358,193.10 | $358,193.10 |
| Available for Unsecured Creditors | $0.00 | $0.00 |

---

[3] The Debtor's inventory consists primarily of perishable goods and unsold liquor without a secondary market.

Before unsecured creditors would be paid any money, all claimants with a higher priority under 11 U.S.C. § 507(a) must be paid in full from the proceeds of liquidation by a chapter 7 trustee. Under the above liquidation analysis, after claimants with higher priorities are paid, there would be **$0.00** available to pay general unsecured creditors without priority.

The liquidation of the Debtor's assets under Chapter 7 would entail the appointment of a Chapter 7 trustee who would not have familiarity with the case and who likely would not run the Debtor's business to facilitate a going concern sale, as will occur under the Plan. Moreover, a Chapter 7 liquidation would likely result in an increase in Administrative Claims, because there would be an additional tier of Administrative Claims by the Chapter 7 trustee and his or her professionals. The Chapter 7 trustee's professionals, including legal counsel and accountants, would add administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtor. The Estate would also be obligated to pay all unpaid expenses incurred by the Debtor during this Bankruptcy Case (such as compensation for professionals), which would continue to be allowed in the Chapter 7 case as well. In addition, the cash to be distributed to Creditors and Holders of Equity Interests would be reduced by the Chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the Chapter 7 trustee.

For all of these reasons, the Debtor believes that the Plan provides a recovery substantially better than the recovery in a Chapter 7 case for Holders of Claims and Equity Interests, and, therefore, meets the requirements of the Best Interest Test.

## F.    Confirmation

### F.1.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. To confirm the Plan, the Bankruptcy Court must determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code. The Bankruptcy Court has set **[____], 2019, at [____] a.m. (prevailing Central Time)** for the Confirmation Hearing. The Confirmation Hearing will be conducted in the courtroom of the Honorable Carol A. Doyle, United States Bankruptcy Court for the Northern District of Illinois, Everett McKinley Dirksen Building, U.S. Courthouse, 219 South Dearborn Street, Courtroom 742, Chicago, Illinois 60604.

### F.2.    Confirmation Standards.

To confirm the Plan, the Bankruptcy Court must find, among other things, that the requirements of section 1129 of the Bankruptcy Code have been satisfied. The requirements of section 1129 of the Bankruptcy Code are listed below:

1.    the Plan complies with the applicable provisions of the Bankruptcy Code;

2.    the Debtor, as Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code;

3.      the Plan has been proposed in good faith and not by any means forbidden by law;

4.      any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been disclosed to the Bankruptcy Court, and any such payment made before the Confirmation is reasonable, or if such payment is to be fixed after the Confirmation, such payment is subject to the approval of the Bankruptcy Court as reasonable;

5.      with respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

6.      each Class of Claims or Interests that is entitled to vote on the Plan either has accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code;

7.      except to the extent that the Holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative and Allowed Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon as reasonably practicable thereafter;

8.      at least one Class of Impaired Claims or Interests will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest of such Class;

9.      Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan;

10.     all fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date; and

11.     the Plan addresses payment of retiree benefits, if any, in accordance with section 1114 of the Bankruptcy Code.

The Debtor believes that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code, including that (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code, (b) the Debtor has complied or will have complied with all of the requirements of chapter 11, and (c) the Plan has been proposed in good faith.

**F.3.**     **Objections to Confirmation**

Any party in interest may object to confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection.  The Bankruptcy Court has set _____, **2019, at 5:00 p.m. (prevailing Central Time)** as the deadline for Filing and serving objections upon the Debtor's attorneys.  Objections to confirmation must be Filed with the Bankruptcy Court electronically or at the following address:

> UNITED STATES BANKRUPTCY COURT
> Northern District of Illinois
> Everett McKinley Dirksen Building
> 219 South Dearborn Street
> Chicago, Illinois 60604

with a copy simultaneously served upon the attorneys for the Debtor at the addresses below:

> GENSBURG CALANDRIELLO & KANTER, P.C.
> 200 West Adams Street, Suite 2425
> Chicago, Illinois 60606
> Attn: E. Philip Groben

**G.     "Cramdown" Provisions**

Pursuant to section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even though a class of claims or equity interests has not voted to accept the plan, as long as one impaired class of claims has accepted the plan (excluding the votes of Insiders, if any) and the plan is "fair and equitable" and "does not discriminate unfairly" against the non-accepting classes.

The Plan only impairs certain Classes of Claims and Equity Interests.  Therefore, the Debtor may, if applicable, pursue confirmation through a "cramdown" provision only under section 1129(b)(2)(B), which states, in pertinent part, that a plan is "fair and equitable" to a class if, among other things, the plan provides, with respect to unsecured claims and equity interests, that the holder of any such claim or equity interest that is junior to the claims or equity interests of such class, will not receive or retain, on account of such junior claim or equity interest, any property unless the senior class is paid in full.  A plan is "fair and equitable" to a class of secured claims if the holders of such a claim (i) retains its liens securing the claims and receive deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property or (ii) realizes the indubitable equivalent of its claims.

A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest.  The Debtor will invoke the "cramdown" provisions of section 1129(b)(2)(B) of the Bankruptcy Code should any voting Class fail to accept the Plan.

# VII. RISK FACTORS

All impaired holders of claims or interests should read and carefully consider the factors set forth below, as well as the other information set forth or otherwise referenced in this disclosure statement, prior to voting to accept or reject the plan.

## A.    Bankruptcy Factors
## A.1.    Classifications of Claims and Equity Interests

Parties in interest may object to the Debtor's classification of Claims and Equity Interests. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the classification scheme is not approved, the Plan cannot be confirmed.

## A.2.    Failure to Receive Requisite Accepting Votes

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  In order for the Plan to be accepted by Holders of Claims who cast Ballots, the affirmative vote of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims in each voting Class is required.

If the requisite votes are not received, this Chapter 11 Case could be converted into a case under chapter 7 of the Bankruptcy Code.  As noted in the Liquidation Analysis, it is unlikely that the distributions under a chapter 7 liquidation would be similar to or as favorable to Holders of Claims or Equity Interests as those proposed in the Plan.

## A.3.    Failure to Confirm the Plan

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor or equity holder of the Debtor might challenge the confirmation of the Plan or the balloting procedures and/or voting results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes and that the

value of Distributions to non-accepting Holders of Claims within a particular Class under the Plan will not be less than the value of Distributions such Holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtor believes that non-accepting Holders within each Class under the Plan will receive Distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case.

If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Equity Interests ultimately would receive with respect to their Claims. If an alternative Plan could not be agreed to, it is possible that the Debtor would convert this Chapter 11 Case to a chapter 7 case, in which case it is likely that Holders of Claims or Equity Interests would receive substantially less favorable treatment than they would receive under the Plan.

In addition, in the event that the Plan is not confirmed, the Debtor will incur substantial expenses related to the development and confirmation of a new plan and possibly the approval of a new disclosure statement. This would only unnecessarily prolong the administration of the Debtor's assets and negatively affect Creditors' and Holders of Equity Interests' recoveries on their Claims and Equity Interests.

Similarly, as described above, in the event this Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, the Debtor will incur substantial expenses related to hiring additional professionals and paying the fees of the chapter 7 trustee. The additional cost will only serve to reduce Distributions to Creditors and Holders of Equity Interests.

## A.5.    Alternative Chapter 11 Plan

If the Plan is not confirmed, any other party-in-interest may attempt to formulate an alternative chapter 11 plan. However, the Debtor believes that such an alternative chapter 11 plan will necessarily be substantially similar to the Plan proposed herewith. The prosecution of an alternative chapter 11 plan would unnecessarily delay Creditors' and Holders of Equity Interests' receipt of Distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller Distributions to Holders of Allowed Claims than are currently provided for in the Plan. Accordingly, the Debtor believes that the Plan will enable all Creditors to realize the greatest possible recovery on their respective Claims and Equity Interests with the least delay.

## VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain material United States federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Equity Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), proposed Treasury Regulations promulgated thereunder, and administrative rulings and court decisions, all as in effect on the date hereof.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan.  To the extent that the following discussion relates to the consequences to Holders of Allowed Claims or Equity Interests, it is limited to Holders that are United States persons within in the meaning of the IRC.  For purposes of the following discussion, a "United States person" is any of the following:

- An individual who is a citizen or resident of the United States;
- A corporation created or organized under the laws of the United States or any state or political subdivision thereof;
- An estate, the income of which is subject to federal income taxation regardless of its source; or
- A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  Thus, no assurance can be given as to whether the IRS will agree with the assertions and conditions discussed herein.  No representations or assurances are being made to the Holders of Claims or Equity Interests with respect to the United States federal income tax consequences described herein.

This summary is limited to those Holders of Claims or Equity Interests who have held such Claims and Equity Interest as capital assets.  Certain Holders (including, among others, insurance companies, banks, tax exempt organizations, financial institutions, broker-dealers, small business investment companies, regulated business companies, investors in pass-through entities, foreign companies, persons who are not citizens or residents of the United States, dealers in securities or foreign currency, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction) may be subject to special rules and are not discussed below.  In addition, this summary does not address federal taxes other than income taxes or the foreign, state, or local tax consequences of the Plan.

## A.      Certain U.S. Federal Income Tax Consequences to the Debtor

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("**COD Income**") realized during the taxable year.  Section 108 of the IRC provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the bankruptcy court and the cancellation is granted by the court or is pursuant to a plan approved by the court.

Section 108 of the IRC requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "**NOLs**"), certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax credit carryovers. Attribute reduction is calculated only after the tax for the year of the discharge has been determined. Section 108 of the IRC further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, Holders of Allowed Class IV Claims are expected to receive less than full payment on their Claims or Equity Interests. The Debtor's liability to the Holders of Allowed Class IV Claims in excess of the amount satisfied by Distributions under the Plan will be canceled and therefore, will result in COD Income to the Debtor. The Debtor should not realize any COD Income, however, to the extent that payment of such Allowed General Unsecured Claims or Allowed Equity Interests would have given rise to a deduction to the Debtor had such amounts been paid. In addition, any COD Income that the Debtor realizes should be excluded from the Debtor's gross income pursuant to the bankruptcy exception to section 108 of the IRC described above, because the cancellation will occur in a case under the Bankruptcy Code, while the taxpayer is under the jurisdiction of the bankruptcy court, and the cancellation is granted by the court or is pursuant to a plan approved by the court.

The exclusion of the COD Income, however, will result in a reduction of certain tax attributes of the Debtor, such as the NOLs, as described above. Because attribute reduction is calculated only after the tax for the year of discharge has been determined, the COD Income realized by the Debtor under the Plan should not diminish the NOLs and other tax attributes that may be available to offset any income and gains recognized by the Debtor in the taxable year that includes the Effective Date.

### B.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOREGOING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE UNCERTAIN IN MANY CASES AND MAY VARY DEPENDING ON A CLAIM HOLDER'S OR INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## IX.    ALTERNATIVES TO THE PLAN

The Debtor has determined that the Plan is the most practical means of providing for maximum recoveries to the Holders of Allowed Claims and Holders of Allowed Equity Interests.

Alternatives to the Plan that have been considered and evaluated by the Debtor during the course of the Chapter 11 Case include (i) liquidation of the Debtor's remaining assets under chapter 7 of the Bankruptcy Code, (ii) dismissal of this Chapter 11 Case and (iii) alternative plan structures. Through consideration of these alternatives to the Plan, the Debtor has concluded that the Plan, in comparison, will likely provide a greater recovery to Holders of Allowed Claims and Holders of Allowed Equity Interests on a more expeditious timetable, and in a manner that minimizes certain risks and costs inherent in any other course of action available to the Debtor.

## A.      Liquidation under Chapter 7

If the Plan or any other chapter 11 plan for the Debtor cannot be confirmed under sections 1129(a) and (b) of the Bankruptcy Code, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, and a trustee would be elected or appointed to liquidate any remaining assets of the Debtor for Distribution to Holders of Allowed Claims and Allowed Equity Interests pursuant to chapter 7 of the Bankruptcy Code.  If a trustee is appointed and the remaining assets of the Debtor are liquidated under chapter 7 of the Bankruptcy Code, all Creditors under the Plan may receive Distributions of a lesser value on account of their Allowed Claims and Allowed Equity Interests and may have to wait a longer period of time to receive such Distributions than they would under the Plan.

## B.      Dismissal

If this Chapter 11 Case is dismissed, the protections of the Bankruptcy Code would disappear, thereby resulting in costly, uncontrolled and protracted litigation in various jurisdictions among and between the Debtor and the Holders of Claims and Equity Interest Interests.  Therefore, the Debtor believes that dismissal of this Chapter 11 Case is not a viable alternative to Confirmation of the Plan.

## C.      Alternative Plan Structures

If the Plan is not confirmed, any other party-in-interest may attempt to formulate an alternative chapter 11 plan.  However, the Debtor believes that such an alternative chapter 11 plan will necessarily be substantially similar to the Plan proposed herewith.  The prosecution of an alternative chapter 11 plan would unnecessarily delay Creditors' and Holders of Equity Interests' receipt of Distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller Distributions to Holders of Allowed Claims in Classes II, III, IV, and V and Holders of Equity Interests in Class VI, than are currently provided for in the Plan.

## X. RECOMMENDATIONS

The Debtor believes that the Plan is substantially preferable to any other plan, preferable to liquidation under chapter 7 of the Bankruptcy Code, and preferable to a dismissal of this Chapter 11 Case.  Therefore, the Debtor strongly recommends that you vote in favor of the Plan.

## XI. CONCLUSION

It is important that you exercise your right to vote on the Plan.  The Debtor believes that the Plan fairly and equitably provides for the treatment of all Claims against, and Equity Interests in, the Debtor and recommends that you cast your Ballot in favor of the Plan.

Respectfully Submitted,

Spybar Management LLC,
    Debtor herein.

By:    /s/ E. Philip Groben
    One of its Attorneys

E. Philip Groben (ARDC# 6299914)
Email: pgroben@gcklegal.com
Matthew T. Gensburg (ARDC# 6187247)
Email: mgensburg@gcklegal.com
GENSBURG CALANDRIELLO & KANTER, P.C.
200 West Adams St., Ste. 2425
Chicago, Illinois 60606
Phone:  312-263-2200
Fax:  312-263-2242